IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Sustainability Management Partners, LLC<br><br>Plaintiff,<br><br>v.<br><br>Tessler Construction Company, Inc.,<br><br>Defendant. | Case No.: 3:23-cv-50113<br><br>Judge Iain D. Johnston |

MEMORANDUM OPINION AND ORDER

\*\*\*

Here's the short of it: Plaintiff Sustainability Management Partners, LLC ("SMP") delivered some materials to Tessler Construction Company, Inc. ("Tessler"). It's almost certainly someone else's fault—maybe Tessler, maybe a developer, maybe a permitting regime—but SMP didn't *install* the materials, as the contract apparently required. SMP says Tessler's in breach because it hasn't paid the balance. The Parties make it more complicated: Tessler, for example, changes its position throughout this litigation and throws Hail Mary legal arguments; SMP oversimplifies its contractual obligations and demands varying specific payments based on those oversimplifications. SMP moved for summary judgment on two of its three claims (breach of contract and account stated), but under these circumstances the Court can't grant it. Details below.

\*\*\*

**Background**

There's a piece of property out in South Elgin, Illinois. Back in or around 2021, a company called "GRP South Elgin" wished to develop that property, so it hired a general contractor, Tessler Construction. Ronald Tessler and his spouse co-own and operate Tessler. Dkt. 103 ¶ 4; dkt. 112 ¶ 4. Among other things, the planned commercial space needed heating, ventilation, and air conditioning (in construction lingo, HVAC) systems. Tessler didn't personally provide or install those systems, instead relying on other entities who perform such work. SMP is one of those companies, providing "specialized" HVAC systems to commercial customers. Dkt.

1

103, Ex. 1 ¶ 2. Apparently a middle-man, SMP obtains the HVAC systems from manufacturers who also install the equipment.

*Proposal and Purchase Order*

On December 13, 2021, Darline Moore, the sole member of SMP, emailed a proposal ("the Proposal") to a Tessler employee.[1] Dkt. 103, Ex. 4. SMP "propose[d] to furnish the equipment listed below," in accordance with the Proposal's later terms and conditions. *Id.* The Proposal then lists entries, with model numbers, quantities, and descriptions. *Id.* Some of those entries are pieces of equipment (e.g. a "Variable Speed Air-Cooled Screw Chiller"), whereas others reflect the installation labor (e.g. "Start-up" or "First Year Labor."). *Id.* The Proposal's quoted price is $1,005,188.00, excluding taxes. *Id.*

According to SMP, 98% of the Proposal price was "the cost of the Project Materials." Dkt. 103 ¶ 12 (citing Moore Affidavit ¶ 5). "Project Materials," per SMP, consists of both the equipment *and* the labor (a/k/a "start-up") entries listed above, dkt. 103 ¶ 5 (terming the nine entries "collectively, 'Project Materials'"); Tessler says the entries reflecting labor aren't "equipment." Dkt. 112 ¶ 5. So, citing evidence that SMP purchased the *equipment* from Koch Air for only $792,182.00, Tessler says only 79% of the Proposal are colloquially materials. Dkt. 112 ¶ 12; dkt. 112, Ex. 1.

The Proposal also includes a "Terms and Conditions of Sale" page. Notable provisions in this case include:

- "**SMP's Terms Control**. SMP's Terms and Conditions of Sale ('Terms') shall control and prevail over any contrary terms in Buyer's purchase order, unless otherwise agreed to in a writing signed by [SMP]. Additional terms proposed by Buyer shall be deemed to have been rejected unless specifically agreed to in writing signed by [SMP]." *Id.*
- "**Shipping, Delivery, and Risk of Loss**. . . . Upon receipt of shipment, it shall be the responsibility of Buyer or the consignee receiving shipment to check material and secure written acknowledgment on the carrier's bill of lading for any shortages, loss or damage. . . ." Another provision limits cancelations and returns, imposing timing and notification requirements. *Id.*
- "**Force Majeure**. SMP shall not be responsible for delays in deliveries due to . . . [certain events] . . and other contingencies beyond SMP's control resulting in

---

[1] Unless it's otherwise relevant, the Court will attribute employee action directly to Tessler or SMP for purposes of deciding this Motion.

2

> impossibility of performance of SMP's duties and obligations." *Id.*
> - Additionally, that Indiana law governs any dispute; the prevailing party in litigation is entitled to costs and reasonable attorney fees; and any quoted prices "shall be increased in amount equal" to taxes. *Id.*

The next day, on December 14, 2021, Tessler emailed SMP a single-page "Purchase Order Contract" (the "Purchase Order"). Dkt. 103, Ex. 5. The brief document confirmed the quoted price and payment structure and noted that SMP shall "supply and deliver all equipment/materials per [the Proposal]." The Court quotes the substantive language in its entirety:

> CONTRACT AMOUNT $1,005,188.00
> Payment Terms: 25% down payment in the amount of $251,297.00 to purchase equipment. Terms are Net 45 days.
>
> Balance due after material is delivered to site, inspected and accepted by Tessler Construction Company, Inc. Terms are Net 45 days.
>
> Time is of the essence with this contract. All equipment/material shall be immediately purchased. All efforts shall be made to deliver[] material/equipment to the site ASAP.
>
> Sustainability Management Partners shall supply and deliver all equipment/materials per [the Proposal].
>
> All materials required by this purchase order are to be shipped to project location unless otherwise stated.

Those are the only terms listed. After a dividing black line, the document states "[a]cceptance of this Purchase Order contract includes any terms and conditions listed above and becomes the Agreement between the parties." Tessler and SMP signed the Purchase Order that same day.[2] *Id.* Lacking the down payment funds, Tessler arranged for the developer, GRP South Elgin to pay SMP the $251,297.00. Dkt. 103 ¶¶ 14–16; dkt. 112 ¶¶ 14–16.

*Delivery Issues*

---

[2] It's inconsequential, but Tessler says SMP signed the Purchase Order on December 16, 2021. Dkt. 112, pg. 15 ¶ 4. The Purchase Order shows a signature dated December 14, 2021.

3

In an affidavit, SMP claims "all Project Materials were delivered" on or before July 29, 2022. Dkt. 103 ¶ 20; dkt. 103, Ex. 1. Recall that SMP's "Project Materials" includes both equipment and labor. But, as Tessler highlights, SMP's own Exhibit shows that many products weren't even *shipped* until August 3 and 4. *See* dkt. 103, Ex. 7. And no one ever provided the start-up labor. So, either "Project Materials" is ill-defined or they weren't "delivered" in August 2022.

Neither the Proposal nor the Purchase Order discuses installation procedures, i.e. how it would happen, when it would occur or who was responsible for initiating it. The Proposal only addresses how Tessler would reject or question the equipment delivery. However, on August 25, 2022, Tessler received an email from Koch/Carrier[3] with a "pre-start up checklist." Dkt. 103 ¶ 27; dkt. 103, Ex. 6. SMP was on the email chain. *Id.* The email explained that to "coordinate a start up date," Carrier "requires the checklist . . . to be completed and returned." *Id.* Tessler responded the next day, saying "Thank you for [] sending these items." *Id.*[4]

Tessler admits that it "never returned the 'pre-startup' checklists,'" dkt. 112 ¶ 30. It explained that start-up couldn't occur because there were "no utilities" and that the construction "permit expired." Dkt. 112 ¶ 31 (Tessler Dep. 61:4–11. Without electricity, the HVAC equipment couldn't operate. At other times, Tessler claims the equipment couldn't function without certain missing pieces. DSOF, dkt. 112 ¶¶ 10–13.[5] According to Tessler, GRP South Elgin hadn't paid the electricity company, so the electricity company cut off electricity. Tessler Dep. 61:4–11. At least some of the construction permits expired on August 7, 2022, and were then renewed "at some point." Tessler Dep. 65:7–12. Tessler concedes that SMP wasn't at fault for the permitting or utility issues. Dkt. 112 ¶ 32.

According to SMP, Tessler never objected to the delivery or contended that the delivery didn't match the Proposal. Dkt. 103 ¶ 21. Tessler provided no evidence that it communicated its utility or permit issues to SMP around the delivery time. Instead, it cites a few messages from December 2022 and January 2023—months after the initial delivery and receipt of an invoice—showing Tessler complaining about missing parts or inoperative units. Dkt. 112 ¶ 21. SMP says those are unsworn statements and, in any event, the items at issue in those messages weren't part of the original Proposal. Dkt. 113, pg. 3. Based on this record, the Court can't determine

---

[3] Koch and/or Carrier are apparently the manufacturers.
[4] Tessler denies it received this notification, saying "[t]he evidence cited does not support the claims. Plaintiff's Exhibit 6 is an invoice and says nothing of checklists." Dkt. 112 ¶ 27. It's true SMP's Exhibit 6 contains a few different items, *one of which* is an invoice, but it includes the email chain. The Court assumes Tessler overlooked that portion.
[5] Tessler's Response to SMP's statement of facts, and its proposed additional facts are in the same docket entry. To make things clear, the Court includes "DSOF" to distinguish Tessler's Response from its proposals.

4

what issues Tessler was referring to in those communications, but it's undisputed that December 2022 was the first time Tessler raised some objection.

*Invoices*

In an affidavit, SMP claims it sent Tessler an invoice on September 20, 2022. Dkt. 103, Ex. 1. SMP calls that the "Original Invoice," and cites to its Exhibit 8. Dkt. 103 ¶ 33. However, Exhibit 8 is an invoice labeled "Revision 2." Dkt. 103, Ex. 8. And though it's "Date[d]" 9/20/2022, so are the other invoices sent on later dates. *See* Exs. 6, 9. There's otherwise no evidence SMP sent or Tessler received a 9/20/2022 invoice.

The Parties, however, agree that *an* invoice was sent and received on October, 27, 2022, attached to an email from SMP calling it a "revised invoice." Dkt. 103 ¶ 35; Dkt. 112, pg. 11. That invoice (Ex. 6) is titled "revised" and dated 9/20/2022, showing an outstanding balance of $810,433.00. The invoice explicitly includes reference to "start-up" costs. *Id.* On December 9, 2022, SMP followed-up with Tessler regarding the October 27 invoice, writing "just wanted to make sure you had this invoice with the revised taxes." *Id.*, pg. 3. Tessler responded, "That matches what we have." *Id.*

From December 15, 2022 through January 10, 2023, Tessler and SMP exchanged messages regarding nonpayment and allegedly undelivered products. *See* DSOF dkt. 112 ¶¶ 10–18; dkt. 113 ¶¶ 12–18. For example, on December 15, Tessler asked SMP "What's going on with the AHU disconnects?" Dkt. 112, Ex. 5. And on December 21, SMP told Tessler that SMP hadn't received payment. Dkt. 112, Ex. 6. Tessler responded that equipment issues need to be resolved before payment. *Id.* The two had similar conversations on January 5, 2023. Dkt. 112, Ex. 7. On January 9, 2023, Tessler wrote that "[it] would pay half the invoice and the other half when it's repaired." Dkt. 112, Ex. 8. The Court isn't sure what "it" refers to. SMP responded, saying it doubted Tessler's plan would be "good enough" for the manufacturers. *Id.* SMP further noted the manufacturer "would like everything paid except the change orders and also the additional $50K taken of[f] for VFD word everything else is done." *Id.*

On January 10, 2023, SMP sent a "Second Revised Notice" for $641,767.72. Dkt. 112, Ex. 11. The attached invoice is the same as SMP's Exhibit 8, which SMP apparently mistakenly identified as the original. Dkt. 114 ¶ 19. The January 10 invoice subtracts $50,000 from the prior invoice, reflecting "VFD retainage." DSOF dkt. 112 ¶ 19; dkt. 114 ¶ 19. Unlike the prior invoice, the January 10 one omits "Includes startup." Dkt. 112 DSOF ¶ 20; dkt. 114 ¶ 20. SMP says the parties never agreed to the January 10 invoice so it's "immaterial," but the Court disagrees.

*Deposition Statements*

SMP deposed Tessler in this case on May 16, 2024. The following colloquy occurred:

5

> Q. Okay. And I've been through the text messages and the emails between you and Darline and repeatedly you're just saying we haven't paid SMP because Ross hasn't paid us, as in Tessler, right?
>
> A. That's correct.
>
> Q. I mean, is that really obviously what's going on here, is that Tessler Construction wants to pay SMP, but it can't because it hasn't been paid by Ross?
>
> A. Yeah. We -- that's how general contractors work, is that we have a customer, we get paid, and then we pay the subcontractors. That's exactly how it works, yes.
>
> Q. And there's no dispute that SMP is owed that money, but you just don't have it?
>
> A. That's correct. And there's no dispute from GRP that we did all the work that we did, either.

Dkt. 103, Ex. 2. Tessler denies that SMP should be paid pursuant to the contract. Dkt. 112 ¶ 37. Tessler doesn't address its earlier testimony, instead referencing the email chains contesting payment. *Id.*

**Analysis**

    a.    *Defining the Agreement*

The Parties dispute what constitutes their agreement. SMP contends that the Proposal *and* the Purchase Order comprise the Agreement, whereas Tessler argues that Purchase Order revoked the Proposal, so only the former controls. As will become clear, Tessler's position is meritless.

Start with the text of each signed document. The Proposal states "SMP's Terms and Conditions of Sale ('Terms') shall control and prevail over any contrary terms in Buyer's purchase order, unless otherwise agreed to in a writing signed by [SMP]. Additional terms proposed by Buyer shall be deemed to have been rejected unless specifically agreed to in writing signed by [SMP]." Dkt. 103 Ex. 4. As SMP argues, the Proposal explicitly anticipated how the Proposal and the Purchase Order would coexist, making clear that the Proposal presumably governs. Submitting the Purchase Order, Tessler agreed. So, barring any "contrary terms" in the Purchase

Order, it's indisputable that the Proposal and the Purchase Order govern harmoniously.[6]

To find a contradiction, Tessler twists a sentence in the Purchase Order, distorting "Acceptance of this Purchase Order contract includes any terms and conditions listed above and becomes the Agreement between the parties." That language, Tessler asserts, wasn't intended merely to incorporate any above-line text, but rather terminate everything in the Proposal.

Tessler relies on *McCarty v. Version Allsteel Press Co.*, 411 N.E.2d 936, 944–45 (Ill. App. Ct. 1980).[7] Though superficially similar, *McCarty* ultimately lends Tessler no support. In that forty-five-year-old case, a seller sent a proposal to a buyer. *Id.* at 940–43. That proposal included certain indemnification terms and provided that the seller's proposal governs over the buyer's purchase order. *Id.* The buyer responded with a seven-page purchase order, including a "detailed list of 'General Specifications' and 'Included Items.'" *Id.* Each page repeatedly informed the seller that "[n]o additional or different terms that may be contained in [seller's] forms or otherwise proposed by vendor will be binding upon" seller unless accepted and signed. *Id.* And the purchase order actually contained relevant terms, imposing a warranty on the seller. *Id.* The buyer stressed those conflicting terms again and again, at least seven times. *Id.* An Illinois appellate court found that the purchase order governed the dispute. *Id.*

Contrast Tessler's Purchase Order. Unlike *McCarty*'s seven-page, carefully-drafted purchase order, Tessler's 100-word confirmation contains practically no new information. It's a stretch to even call them "terms and conditions." But even if they're such and even if they conflict with the Proposal's, *McCarty*'s still inapposite. The buyer in that case *explicitly and repeatedly* reminded the seller that, upon signing the order, the seller's proposed terms meant nothing. Tesser, by contrast, rests on the *implicit* inference that if the signed Purchase Order becomes the agreement, then it necessarily (and silently) extinguishes everything in the Proposal. That's a leap in ordinary contract interpretation, *see* U.C.C. § 2-207 (requiring "express" conditional language) and absurd when, as in this case, the Purchase Order hardly has terms— let alone conflicting ones—of its own.

---

[6] Tessler tries forcing the Parties back-and-forth into rigid contract boxes, calling the Proposal the "offer" and the Order a "counteroffer." Such labels are less useful when, as in this case, the documents clearly interact with one another. The Court instead must determine if and how the Order *modifies* the Proposal, and whether SMP agreed to such modifications. *See* U.C.C. § 2-207.

[7] Tessler also excises a phrase from *Am. Bankers Ins. Co. of Florida v. Shockley*, 3 F.4th 322, 331 (7th Cir. 2021). As SMP notes, that insurance policy dispute doesn't meaningfully inform this case.

7

Tessler knows that too. As SMP highlights, Tessler's Answer admits that "[t]he purchase order and SMP proposal collectively represented the parties' agreement."[8] After obtaining a new attorney, Tessler for the first time argues in its Response that only the Purchase Order controls the dispute. That gives the Court an independent basis to ignore Tessler's arguments but because it also rejects the substantive argument, the Court won't further address Tessler's inconsistencies. So, the Court finds that the Proposal and the Purchase Order together comprise the Parties' Agreement.

      b.     *Governing Law*

With those agreements in place, the Court turns to the governing law. The Proposal demands that the transaction "shall be governed by and interpreted in accordance with the laws of the State of Indiana." Dkt. 103, Ex. 4, pg. 6. Exercising its diversity jurisdiction over this case, the Court "applies the choice-of-law rules of the state in which it sits." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). Illinois courts, in turn, generally honor an agreement's choice-of-law provision. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 194 (Ill. 2002). Tessler raises no public policy or other objection that would dislodge the ordinary rule.[9] So, the Court honors the Proposal's terms and applies Indiana law. The Parties further agree that Article 2 of the U.C.C. governs the dispute. Dkt. 104, pg. 5; dkt. 111, pg. 5.[10]

      c.     *Summary Judgment*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable jury could return a verdict for the nonmovant, construing the evidence and all reasonable inferences in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986); *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). SMP

---

[8] Specifically, Tessler answered "Tessler states that the documents speak for themselves, and denies any additional terms of any alleged agreement between Tessler and SMP exist *outside the terms of* [the Proposal] and [the Purchase Order]" (emphasis added). Dkt. 22 ¶ 11. Because they never denied those two documents comprised the Agreement, they legally admitted it. *See* F.R.C.P. R. 8.

[9] Tessler erroneously assumes the Proposal doesn't apply based on its argument discussed above. So, it concludes that Illinois law applies, offering no argument in the alternative—not that one would be persuasive.

[10] In its Response, Tessler later contends that *parts* of the U.C.C. don't apply, specifically those dealing with acceptance and objection, arguing that the Parties "varied" the U.C.C.'s terms. Dkt. 111, pg. 10. That's a tough argument, but it intersects with performance and breach issues. As discussed below, the Court ultimately denies SMP's Motion specifically because those issues are still unclear. So it can't decide whether or to what extent the Parties definition of performance or breach—whatever that might be—diverges from the U.C.C.

moves for summary judgment on two of its claims, (1) breach of contract and (2) account stated.[11] The Court addresses each in turn.

### 1. Breach of Contract

Under Indiana law, the "essential elements of any breach of contract claim are the existence of a contract, the defendant's breach thereof, and damages." *Ent. U.S.A., Inc. v. Moorehead Commc'ns, Inc.*, 897 F.3d 786, 793 (7th Cir. 2018) (citing *Old. Nat'l Bank v. Kelly*, 31 N.E.3d 522, 531 (Ind. App. 2015). Indiana contract law requires a plaintiff to prove its damages with reasonable certainty. *Ent. U.S.A., Inc.*, 897 F.3d at 793. The burden falls on plaintiff because damages are an element of a breach of contract action. *Id.*

SMP falls short on the breach and damages prongs. SMP asserts that it delivered the "Project Materials" to Tessler and that Tessler failed to timely reject the items per the U.C.C. So, SMP concludes Tessler breached. Tessler claims that some materials were still missing months after the initial delivery in August 2022. But let's assume Tessler's wrong and SMP properly delivered all physical materials in that initial shipment. SMP still can't carry its burden, because it imprecisely defines "Project Materials." The Proposal promises to "furnish the equipment listed below." That list, in turn, includes physical equipment *and* "start-up" items, i.e. *labor* costs. Oversimplifying the issue, SMP lumps those two groups together, referring to them collectively throughout its Statement of Facts as "Project Materials." Dkt. 103, pgs. 2–3. SMP then contends that "all Project Materials were delivered on or before July 29, 2022." SMP's own documents refute that delivery date, but regardless it admits that it never provided the start-up labor. So, by definition, it didn't furnish all of the "Project Materials." Nevertheless, SMP says it fully performed its obligations.

Now, perhaps Tessler was required to complete the pre-start-up forms. And it was likely Tessler's job to timely notify SMP once it realized it had permitting and electricity problems.[12] The record indeed suggests that Tessler failed to act properly. But it might also be true that Tessler isn't legally responsible for the "start-up" costs if SMP never provided them. The Agreement is silent on all of these material issues. Defining "Project Materials" as it does, SMP makes it seem that everything's settled: SMP delivered and Tessler didn't pay. SMP might ultimately be right, but the situation is clearly more complicated. Without litigating the scope of the Parties' agreement, their course of conduct, and similar performance, the Court can't summarily conclude whether SMP performed or Tessler breached. And as discussed

---

[11] Count I is a claim for account stated, and Count II is a claim for breach of contract. Analytically, it makes sense to address them in reverse order.

[12] Tessler and SMP also disagree whether performance was rendered impossible, and if so, who's responsible. Impossibility may go both to the performance (SMP unable to start-up) and Tessler's defense (lacking permits and electricity). Impossibility, on its own, is a nuanced factual question, one that SMP fails to show is ripe for summary judgment.

9

in the next section, it's impossible to say based on this record what Tessler would owe assuming it breached.

It's true Tessler fails to explain its many inconsistent positions, a problem it will have to confront at trial. Tessler largely admitted at its deposition that at least part of the reason it didn't pay SMP was because Tessler didn't have the money. Indeed, at that deposition, Tessler all but admits that it failed to perform, raising possible Rule 11 concerns that the Court may address at a later point. With much of the Materials delivered and no post-deposit payment, Tessler faces a steep hill in arguing it's not in some breach. But based on these facts, the Court simply can't make that determination.

### 2. Account Stated

Because the Court denies SMP's Motion as to the breach of contract claim, it can't conclude whether or to what extent Tessler owes money. Under Indiana law, "[a]n account stated is an agreement between the parties that all items of an account and balance are correct, together with a promise, expressed or implied to pay the balance." 745 N.E. 2d. 233, 236 (Ind. Ct. App. 2001). SMP admits Illinois law is largely identical. "An 'account stated' is a form of proving damages for a breach of a promise to pay on a contract." *Air Tiger Express, Inc. v. Barclay*, No. 08-cv1945, 2008 U.S. Dist. LEXIS 51432 (N.D. Ill 2008).

Without sufficiently demonstrating breach, SMP nevertheless contends that Tessler owes "$753,891.00 plus tax." Dkt. 18 ¶ 53. That number reflects one of SMP's invoices, which apparently stems from the Proposal's price, minus the down payment. *See* dkt. 103, Ex. 6, pg. 5. Even assuming SMP showed breach, it's premature to award precise damages. SMP points to Tessler's deposition, in which he admitted Tessler owes money. *See* dkt. 103, pg. 7. But SMP mischaracterizes that testimony, saying Tessler admitted SMP "should be paid *pursuant to the contract*." *Id.* (emphasis added). Tessler didn't say that. Owing money and owning the specific figure are two separate questions. SMP also cites a brief email exchange in which SMP sent the $753,891.00 invoice and Tessler responded "that matches what we have." SMP says that evidence conclusively establishes that Tessler owes such an amount. It doesn't.

SMP further muddies the water, attaching three invoices to its Motion. It claims it sent an invoice in September and another in October, and a third in January. One is labeled "Revision 2," another "Revised." One asks for $641,767.72, another for $753,891.00, reflecting a "deduction." There's later discussion about waiving $50K. All that's to say even if Tessler owes money, indeed even if it owes money for the unprovided start-up costs, the Court can't possibly just pick a disputed sum. So, the Court denies Tessler's Motion regarding the account stated claim.

**Conclusion**

10

For the reasons above, the Court denies SMP's Motion for summary judgment on Counts I and II. It finds that the Proposal and the Purchase Order together comprise the Parties' Agreement. *See* F.R.C.P. R. 56(g).

The Court adds a quick note: Under the Agreement, Tessler may well owe reasonable attorneys' fees if it loses this case, a not unlikely outcome. The Court knows many skilled mediators, including ones experienced in construction-related disputes. Wise attorneys would take advantage of such resources under these circumstances. Hint, hint.

Entered: March 5, 2025          By:_____

                                Iain D. Johnston

                                U.S. District Judge

11